## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| KEVIN HUGHES, JR., b/n/f Sophia J. Arshad, and JERAMIE HUGHES | ) ) ) | |
|      Plaintiffs, | ) ) | |
| vs. | ) ) | Cause No.:   2:17-cv-107 |
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, THE TRAVELERS COMPANIES, INC., THE TRAVELERS INDEMNITY COMPANY, and THE TRAVELERS INDEMNITY COMPANY OF CONNECTICUT, | ) ) ) ) ) ) ) | |
|      Defendants. | ) | |

## COMPLAINT AND JURY DEMAND

COMES NOW Plaintiffs, Kevin Hughes, Jr., b/n/f Sophia Arshad, individually and as assignee of Linda K. Barnett, and Jeramie Hughes, individually and as assignee of Linda K. Barnett ("Plaintiffs") by and through their attorneys and for their Complaint and Jury Demand against Travelers Property Casualty Company of America, The Travelers Companies, Inc., The Travelers Indemnity Company, and The Travelers Indemnity Company of Connecticut (collectively "Travelers") state as follows:

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff, Kevin Hughes, Jr. ("Kevin"), is a natural person with his residence located in Brookston, Indiana, and is a resident, domiciliary, and citizen of the State of Indiana.

2.     Kevin's court-appointed guardian, Sophia Arshad, is a resident, domiciliary, and citizen of the State of Indiana and brings this action on Kevin's behalf solely in her capacity as his court-appointed legal guardian.

3.      Plaintiff Jeramie Hughes ("Jeramie") is a natural person with his residence located in Portage, Indiana, and is a resident, domiciliary, and citizen of the State of Indiana.

4.      Kevin and Jeramie seek recovery in this action individually and on certain legal claims they hold on assignment from Linda K. Barnett ("Barnett"), who is a non-party.  Non-party Barnett is also a resident, domiciliary, and citizen of the State of Indiana.

5.      Defendant, Travelers Property Casualty of America ("Travelers Property") is a Connecticut Corporation with its principal place of business in Hartford, Connecticut.

6.      Defendant, The Travelers Indemnity Company is a Connecticut Corporation with its principal place of business in Hartford, Connecticut.

7.      The Travelers Indemnity Company of Connecticut is a Connecticut Corporation with its principal place of business in Hartford, Connecticut.

8.      Defendant, The Travelers Companies, Inc., is a Minnesota Corporation with its principal place of business in New York, New York and, upon information and belief, is the parent and/or holding company of the foregoing entities.

9.      The above-named Defendants are engaged in the business of underwriting various programs of liability insurance and are collectively referred to herein as "Travelers."

10.      This matter involves, *inter alia*, claims for declaratory judgment pursuant to 28 U.S.C. § 2201 and § 2202 based on an Illinois contract of Commercial Auto insurance issued by Travelers Property to Sun Times Media Group, Inc. ("Sun Times Media") as principal named insured, which at relevant times was a Delaware corporation with its registered principal place of business located at 350 N. Orleans, Chicago, Illinois.

11.    The amounts in controversy in this matter, exclusive of costs and interest, exceed $75,000.00 (seventy-five thousand dollars).  This Court has subject matter jurisdiction over all claims asserted herein by virtue of complete diversity of citizenship between the Plaintiffs and Defendant pursuant to 28 U.S.C. §1332(a).

12.    Venue is proper in the Northern District of Indiana pursuant to 28 U.S.C. § 1391.

## COMMON ALLEGATIONS

### *Overview of Claims*

13.    Kevin and Jeramie (collectively "Plaintiffs") restate and incorporate by reference rhetorical paragraphs 1 – 12 as though fully set forth herein.

14.    Plaintiffs' claims arise generally out of a failure by Travelers to defend Barnett, an additional insured under an Illinois policy of insurance issued to Travelers' primary insured, Sun-Times Media Group, Inc., in an action involving a serious auto accident in a suit filed by the Plaintiffs against Linda Barnett in Lake County, Indiana Circuit Court Cause No. 45C01-0710-CT-00156 (hereafter "Suit").

15.    Although Barnett was entitled to a defense of the allegations in the Suit to the same extent as other insureds under the Auto Policy issued by Travelers to Sun-Times Media, Travelers refused to defend Barnett in the Suit despite being fully aware of it from the inception.

16.    Travelers defended its other insureds in the same Suit against the same allegations, hiring multiple law firms and providing the defense without any reservation of rights.  Travelers did nothing to protect Barnett.  In fact, Travelers repeatedly and actively concealed Barnett's status as an insured under the Auto Policy, misrepresenting that the Auto Policy did not exist or was not applicable to the Suit despite defending its other insureds under the same Auto Policy.

3

17.     Travelers not only abandoned Barnett and concealed the Auto Policy from her, it directed that Barnett be sued for indemnity by its other insured under the Policy in a subrogation action in which Travelers attempted to recover from Barnett the very indemnity benefits Travelers owed to Barnett under the Auto Policy that it was concealing from her.

18.     Following nearly six years of litigation, on October 17, 2013, Kevin and Jeramie made a comprehensive settlement demand against Barnett consisting of more than 300 pages of supporting exhibits.   Travelers was fully aware of this demand, yet did not acknowledge or respond to the demand while continuing to deny the existence and applicability of the Auto Policy to any of the parties.

19.     Following the lack of response to Plaintiffs' Settlement Demands, Kevin and Jeramie brought summary judgment motions against Barnett which were the subject of proceedings in the Lake County Circuit Court.  Following briefing and hearing on the matters, on March 10, 2015 the court entered judgment in favor of Kevin and against Barnett in the amount of $23,457,431 and in favor of Jeramie and against Barnett in the amount of $193,669. A true and accurate copy of this judgment, styled "Entry of Final Judgment Linda K. Barnett" is attached hereto as **Exhibit A** ("Hughes Judgments").

20.     With statutory judgment interest, Barnett's obligation on these judgments is **$27,430,091** as of March 8, 2017, with additional interest accruing in an amount of **$1,892,088** *per annum* until satisfied.

21.     Travelers did not produce its subject Auto Policy until more than a month after the Hughes Judgments were entered against Barnett.  In producing the policy for the first time, Travelers'-retained counsel continued to deny the applicability of such policy and claimed it had never been requested.

22.    Abandoned by Travelers, subject to massive judgments, and facing ongoing frivolous litigation against her at the direction of Travelers, Barnett reached a negotiated settlement agreement with Plaintiffs in which she assigned all claims she might hold against Travelers to the Hughes ("Settlement and Assignment").  A true and accurate copy of the Settlement and Assignment is attached hereto as **Exhibit B.**

23.    Through the present action, Plaintiffs seek declaratory judgment requiring Travelers satisfaction of the existing Hughes Judgments under the provisions of Travelers Property's Auto Policy, in the amount of **$27,430,091** as of March 8, 2017 with interest accruing at rate of 8% thereafter.  Plaintiffs further seek recovery sounding in breach of contract, breach of the duty of good faith and fair dealing, and fraudulent misrepresentation and concealment. Plaintiffs seek, *inter alia*, an award of punitive damages in an amount no less than three times the amount of the existing judgments, or **$82,290,273** as of March 8, 2017, and in the maximum amount permitted at law.

### *The Underlying Car Crash*

24.    On or about September 9, 2007, Kevin and Jeramie were passengers in a vehicle driven by Barnett on September 9, 2007, at which time she was engaged in her employment delivering newspapers for the Post-Tribune Company, LLC and performing under a contract with the Chicago Sun-Times.

25.    At approximately 6:35 a.m., Barnett was driving in heavy fog while attempting to meet a 7:00 a.m. Sunday delivery deadline imposed by the Post-Tribune.  This delivery deadline was controlled by her immediate supervisor at the Post-Tribune and it was at the supervisor's sole discretion to adjust delivery deadlines due to weather related issues.

26.    Despite heavy fog, no action was taken to delay or alter delivery deadlines. Police investigation concluded heavy fog limited visibility to a few hundred feet.

27.    By approximately 6:35a.m., Barnett was running "way" behind on her deliveries due to the heavy fog.  Barnett was traveling northbound on CR900W in LaPorte County, Indiana trying to meet the 7:00 a.m. deadline imposed and enforced at the discretion of the Post-Tribune. She was traveling at a rate of 48 mph despite substantial limitations on visibility created by the weather conditions and a posted speed limit of 45 miles-per-hour.

28.    Barnett approached the intersection of CR250 and CR 900W and, as a result of the heavy fog, failed to observe a stop sign requiring Barnett to yield the right of way.   Barnett disregarded the stop sign and was struck at high speed by a vehicle traveling westbound on CR250 which had the right of way.

29.    Barnett was cited for a failure to yield the right of way, with the LaPorte County Sheriff's Department Case Report concluding "[h]eavy fog was also a contributing factor to the crash."

30.    The resulting collision occurred with such force that the Barnett vehicle careened into a nearby field.  Jeramie, who was a passenger in the front seat, was thrown from the vehicle. Kevin, who was in the rear seat of the vehicle, was trapped within the vehicle and suffered catastrophic traumatic head injuries.

31.    Following the crash, Barnett's Post-Tribune supervisor personally delivered Post-Tribune newspapers to the remaining customers on the Post-Tribune route because of Barnett's incapacity.

*Injuries to Jeramie and Kevin*

32.    Following the crash, Jeramie was secured to a backboard and cervical spine

6

immobilizer and transported by EMS. He scored a 12 on the Glasglow Coma Scale, which signifies a moderate brain injury. Jeramie had severe pain in his chest and multiple lacerations on his face and right ear. Jeramie also suffered multiple rib fractures, a collapsed lung, and a nasal fracture. He had a chest tube inserted and CT scans were performed of Jeramie's head, cervical spine, chest, abdomen and pelvis. The CT scans confirmed a right-sided pneumothorax with chest tube present. Jeramie was admitted to the Intensive Care Unit for an extended period.

33.    Jeramie was 15-years-old at the time of the incident. Medical bills for Jeramie's care totaled $48,414.48.

34.    Kevin suffered catastrophic, severe traumatic brain injuries that are permanent and have left him totally disabled and under the protection of a court appointed guardianship for the entirety of his adult life. Following the injuries, Kevin was given a Glasgow Coma Score ("GCS") of 5, signifying a traumatic brain injury classified as "severe."

35.    The GCS is a standardized test for traumatic brain injury and is considered both reliable and highly correlated with long term recovery outcome. Severe traumatic brain injuries are signified by GCS scores in a range between 3-8, with 3 being the most severe brain injury possible.

36.    Following the crash, Kevin remained in a coma for approximately 5 weeks with life threatening injuries. When he emerged from the coma he was unable to follow basic verbal commands. He was hospitalized in various facilities for a variety of life threatening issues and, three-months post-accident, Kevin remained unable to eat, on a feeding tube, and incontinent of bowel and bladder. Kevin remained hospitalized for nearly six months.

37.    Kevin's treating neurologist and neuropsychologist both confirm that Kevin's severe brain injuries have left him totally and permanently disabled and unsafe for independent

living for the remainder of his life. Kevin was 17-years-old at the time of the collision and is 26 as of the time of filing. At all times during his adult life, he has remained under a court-ordered guardianship over his person.

38.    Additional medical evaluation of Kevin, conducted under the supervision of Dr. Paul Deutsch, further confirms that Kevin's injuries require lifelong care in a center specializing in brain injuries or equivalent care by professionals in a supportive home setting.

39.    Kevin has been diagnosed as suffering from severe dementia due to his traumatic brain injuries which substantially impair his executive brain function and have resulted in pronounced deficits in Kevin's cognitive, emotional, and social function. These deficits also impact his physical abilities and have decimated Kevin's short term and delayed memory. Neurological testing conducted in 2016 confirms that Kevin scores in the lowest 1 percentile in testing for both immediate memory recall and delayed recall.

40.    Kevin's injuries have also manifested in notable behavioral and impulse control issues that largely destroyed his family and personal relationships and repeatedly endangered Kevin's life, causing him to make multiple attempts at suicide which have resulted in inpatient hospitalization for psychiatric care.

41.    These deficits have also caused Kevin to run away from caregivers and retreat from those who care about him most. Kevin's brain injuries have resulted in a range of dangerous behaviors, including him wandering in the middle of the night into the houses of neighbors and, on at least one occasion, traveling across the country to Oregon without any financial resources or notifying caregivers to meet someone he had just met on the Internet, resulting in Kevin's being homelessness for a period.

42.    Kevin's permanent physical impairments resulting from the September 9, 2007

8

car crash include, but are not limited to:

     a.  Severe headaches, often recurring daily for several hours;

     b.  Substantial permanent scarring on neck and torso;

     c.  Vision problems, including blurred vision and double vision;

     d.  Significant difficulty sleeping at night with night terrors caused by neurological disorders and post-traumatic stress which have persisted since 2007 and worsened over time;

     e.  Falling asleep at undesirable times and in unexpected situations, such as the middle of the day and even standing up;

     f.  Periodic problems with swallowing food and aspiration of liquids;

     g.  Generalized fatigue;

     h.  Difficulty standing for an extended period;

     i.  Pronounced impairment with walking and gait;

     j.  Significant problems with physical balance, including difficulty descending stairs without assistance;

     k.  Generalized right side body weakness; and

     l.  Periodic "blackout episodes" brought on by anxiety, stress, and emotional outbursts which can last for 30 minutes or more with Kevin having no memory of the episodes.

    43.    Kevin's dementia includes severe limitations to his memory, including immediate recall, delayed memory function, and remote memory.  His most severe deficit is delayed memory and Kevin cannot remember details of information given to him after a short period of time, scoring in the bottom 1% of neurological testing in this area.

    44.    Kevin's dementia also manifests in significant deficits in the area of focus, attention and concentration with limitations on his executive function and thought processing. These injuries include, but are not limited to:

     a.  substantial deficits in abstract reading and conceptualization;

    b.   slowing of thought process and inability to maintain organization of thought or engage in appropriate planning;

    c.   inability to properly differentiate mentally between important or unimportant information and prioritize action based on this information;

    d.   significant impairment to problem solving ability;

    e.   regular spells of confusion;

    f.   easy distraction by any other visual or auditory stimulation in his environment; and

    g.   lack of awareness of his deficits and abilities.

45.    Kevin also suffers permanent behavioral and psychological impairments due to diagnosed dementia and personality disorder resulting from the brain injury.  These injuries include, but are not limited to:

    a.   significant disinhibition and loss of control;

    b.   engaging in acting out behavior and unsafe actions towards himself and others;

    c.   extreme angry outbursts and loss of temper without provocation or reason;

    d.   loss of emotional control;

    e.   pronounced social deficits, including an inability to understand and respond to social cues or understand and manage relationships;

    f.   dementia-induced behavior resulting in Kevin saying things that may be offensive or inappropriate to the social situation without comprehension of the same;

    g.   volatile and impulsive relationships where none existed prior to the crash;

    h.   a breakdown in important personal relationships;

    i.   efforts at self-isolation to avoid social situations due to deficits;

    j.   significant emotional and personality regression; and

    k.   self-isolation to avoid social interaction due to Kevin's vague awareness of his

10

deficits, contributing to significant problems with self-esteem and depression.

46.     Kevin's neurologist, Dr. Richard Cristea, opined in a narrative report of January 31, 2017 that Kevin's "prognosis is extremely poor, as he will not undergo further recovery. His diagnoses are noted above are chronic and permanent. He is unable to work in any capacity. He is unable to care for himself and requires 24-hour supervision. As he ages, he is at significant risk of his mental capacities worsening."  (Cristea Jan. 31, 2017 Narrative Report at p. 2).

47.     An economic analysis performed by Dr. James Bernard concludes that Kevin's total economic loss resulting from the crash, including past medical expenses, past and future lost earnings, and future medical care could be as much as $11,783,000 reduced to present value.

*Plaintiffs' Suit Against the Sun-Times Company, Post-Tribune LLC,*
*and Linda K. Barnett*

48.     Plaintiffs filed their Suit against Defendants Linda K. Barnett, The Sun-Times Company, Inc. ("Sun-Times"), and the Post-Tribune Company LLC ("Post-Tribune") in October 2007 in Lake County, Indiana Circuit Court. The Suit, sounding in negligence, alleges that Kevin and Jeramie suffered their injuries while passengers in the Barnett vehicle and that Barnett was acting within the course and scope of her employment with the Sun Times and Post-Tribune at the time of the collision.  (See Second Amend. Comp., a true and accurate copy of which is attached as **Exhibit C**).

49.     Specifically, Plaintiffs' Suit pleads, in relevant part:

> At the time of the collision and the acts of negligence by Defendant Barnett, **such Defendant was acting within the scope of and in furtherance of her employment relationship with Defendant Sun Times and Defendant Post Tribune** and/or was acting as an agent of Defendant Sun Times and Post Tribune.

(*Id.* at p. 3, ¶ 15) (emphasis added).

11

50.      The Suit pleadings were subsequently served with service of the Post-Tribune at its registered principal place of business in Chicago occurring on or before December 11, 2007.

51.      At the time of the collision and other relevant times hereto, the Sun Times and Post-Tribune were wholly owned by the Sun-Times Media Group, Inc. ("Sun-Times Media"), maintaining its principal place of business and offices at 350 N. Orleans in Chicago, Illinois. Sun-Times Media remained the sole or principal owner of the Sun Times and Post-Tribune up to and through their sale as part of bankruptcy proceedings in 2009.

*Sun-Times Media's Illinois Insurance Program*

52.      At all times relevant, Sun-Times Media was the primary named insured under a custom insurance program brokered and negotiated through Dann Brothers, Inc., an Illinois insurance brokerage located at 1500 S Lakeside Dr, Bannockburn, Illinois.

53.      Application for this package of insurance was made in greater Chicago, Illinois with negotiations for coverage terms conducted by and between Sun-Times Media at its Chicago, Illinois principal place of business and Dann Brothers, Inc.'s Illinois office.

54.      The policies were delivered to Sun-Times Media at its Chicago, Illinois headquarters, and premiums for the insurance program were paid by Sun-Times Media from its Chicago headquarters and banking accounts it maintained in Illinois.  The policy period for the primary auto policy issued under the program was determined by local time at Sun-Times Media's Chicago, Illinois headquarters and all losses under the policy were payable to Sun-Times Media at that location.

55.      Sun-Times Media also obtained coverage under this insurance program for all companies over which it held a majority interest, including Sun Times and the Post-Tribune. Both Sun-Times and Post-Tribune maintained their registered principal places of business in

Chicago, Illinois and, upon information and belief, all entities in which Sun-Times Media had a majority ownership stake maintained their registered principal places of business in Illinois.

56.     According to bankruptcy materials filed by Sun-Times Media, all of its principal operations and those of the companies it owned were within the Chicago metropolitan area, with the large majority of such operations in Illinois.  A substantial majority of the real property and business operations covered under the insurance program were in Illinois.

*Travelers Duty to Defend Sun-Times, Post-Tribune, and Barnett
Against Allegations in the Hughes Suit*

57.     As part of Sun-Times Media's insurance program, Travelers' Property Casualty Company of America underwrote a comprehensive insurance program including a first-layer Commercial Auto Policy, Number TC2J-CAP-281K6779-TIL07 with liability limits of $1,000,000 (one-million dollars) per accident ("Auto Policy").  A true and accurate copy of the Auto Policy is attached hereto as **Exhibit D**.

58.     Coverage periods on the Auto Policy ran from 12:01 A.M. standard time, as determined at Sun-Time Media's Chicago, Illinois headquarters, from January 1, 2007 to January 1, 2008.

59.     Travelers further provided Sun-Times Media a first-layer excess policy of insurance of $25,000,000 (twenty-five million dollars), Policy No. PSM-CUP-5595L040-TIL-07, underwritten by The Travelers Indemnity Company, Travelers Property Casualty Company of America, and The Travelers Indemnity Company of Connecticut ("Travelers' Excess Policy").  A true and accurate copy of the Travelers' Excess Policy is attached hereto as **Exhibit E.**

60.     The Travelers' Excess Policy specifically schedules the Travelers' Auto Policy as an underlying policy via form CG D0 23 04 96 and it provides additional umbrella indemnity

protection over the Auto Policy up to its stated additional limits.

61.     Additional layers of excess insurance coverage were underwritten by other insurers who are not parties to this action, specifically (1) a second layer excess policy issued by Liberty Insurance Underwriters, Inc. in the amount of $50,000,000 (fifty million dollars), Policy Number LQ1B71198591016 ("Liberty Mutual Excess Policy"), and a third layer excess policy underwritten by Fireman's Fund for an additional $50,000,000 (fifty-million dollars).  In total, the insurance package brokered for Sun Times Media represents $1,000,000 in primary Commercial Auto coverage and $125,000,000 of drop-down umbrella coverage under the excess policies.

62.     The Sun Times, the Post-Tribune and Barnett were all insured against allegations in Plaintiffs' Suit pursuant to this program of insurance, with the Auto Policy constituting the first-layer primary insurance and the Travelers' Excess Policy the first-layer excess.  Travelers' obligations regarding its duty to defend and indemnify the Suit were defined at all relevant times by the Auto Policy.

63.     Both the Sun Times and Post-Tribune were additional insureds under the Auto Policy by endorsement that extends coverage to any organization in which Sun-Times Media maintained ownership or a majority interest.  (Auto Policy endorsement IL T3 40 03 95). Barnett was an additional insured under the Auto Policy by endorsement CA T3 94 01 04, extending Travelers' defense and indemnity obligations to those alleged to be acting within the course and scope of employment with Sun Times or Post Tribune, as Plaintiffs allege in Paragraph 15 of their Suit against Barnett and elsewhere in the Second Amended Complaint. (Auto Policy, **Exhibit D** endorsement CA T3 94 01 04; Second Amended Comp., **Exhibit C**, ¶ 15).

14

64.     The indemnity portion of the Auto Policy provides that Travelers

> will pay all sums an "insured" legally must pay as damages
> because of "bodily injury" or "property damage" to which this
> insurance applies, caused by an "accident" and resulting from the
> ownership, maintenance or use of a covered "auto".

(Auto Policy, **Exhibit D**, p. 2 Sec. II.A, Ex. G).  The Auto Policy provides that a covered auto is

"any auto" which would include the auto driven by Barnett while in the alleged course and scope

of her employment with Sun Times and Post-Tribune.

65.     The Auto Policy further imposes upon Travelers a right and duty to defend all

actions seeking such damages: "We have the right and duty to defend any 'insured' against a

'suit' asking for such damages…"  (*Id.*).

66.     Travelers' duty to defend under the Auto Policy required that Travelers defend

Sun Times, Post-Tribune, and Barnett against the Hughes' Suit by virtue of its allegations that

Plaintiffs were injured as a result of Barnett's negligence while engaged in the course and scope

of her employment with Sun Times and Post-Tribune.

67.     Following service of the Second Amended Complaint, Suit papers were timely

forwarded to Travelers by its insured no later than December 17, 2007.  Since that time,

Travelers has been fully aware of the Suit and its allegations against Sun Times, Post-Tribune,

and Barnett that arose from Barnett's alleged actions while in the scope of her employment with

Sun Times and Post-Tribune.

68.     Allegations in the Suit gave rise to a duty by Travelers under the Auto Policy to

defend the Sun Times, Post-Tribune, and Barnett against allegations in the Suit even if any or all

of these entities contested allegations made in the Suit even if the allegations were without merit.

69.     Travelers accepted, without reservation of rights, its right and duty to defend the

Sun Times and Post-Tribune against Plaintiffs' Suit allegations.  On or around December 17,

2007, Travelers retained and appointed the Chicago, Illinois law firm of Cremer, Kopon, Shaughnessy, & Spina, LLC and Illinois attorney Gary Jansen (collectively "Cremer, Kopon lawyers") to represent Sun Times and Post-Tribune as part of Travelers' duty to defend them against allegations in the Suit and in an exercise of its right to do so.

70.     At the time of retention, Cremer, Kopon had a single office located in Chicago, Illinois at 180 North LaSalle Street, Suite 3300.  Mr. Jansen was admitted to the bar of Illinois and no other state.  Cremer, Kopon is now known as Cremer, Spina, Shaughnessy, Jansen and Siegert, LLC ("Cremer, Spina") with its sole office at One N. Franklin, 10th Floor in Chicago, Illinois.

71.     At some time in 2008, Travelers additionally retained the national law firm of Hinshaw & Culbertson LLP to also represent Post-Tribune against Plaintiffs' allegations in the Suit.  The Hinshaw firm is headquartered in Chicago, is nationwide in its practice, and has approximately 500 lawyers.

72.      By virtue of their engagement by Travelers to defend Post-Tribune and/or Sun Times, Cremer, Kopon; Cremer, Spina; Mr. Jansen; and the Hinshaw firm (collectively "Travelers-retained counsel") at all relevant times had an attorney/client and agency relationship with Travelers under applicable law.

73.     Travelers, in the exercise of its right to defend Post-Tribune and Sun Times under the Auto Policy, at all times exercised a right to control, direct, and/or manage the defense provided by Travelers and Travelers-retained counsel.

74.     Travelers-retained counsel confirmed in discovery responses in the Suit that "Travelers has not issued a reservation of rights letter in this matter, and has appointed defense counsel to represent Defendant in this case" (referring to Defendant Post-Tribune) (Def. May 29,

2012 Post-Trib. Disc. Response at p. 2).

75.    At all times relevant, Travelers controlled and paid legal costs associated with actions by Travelers-retained counsel described herein, including strategies by which Travelers repeatedly misrepresented the existence and applicability of the Auto Policy, concealed the Auto Policy and Barnett's status as an insured entitled to a defense, and prosecuted a lawsuit against Barnett.

76.    Although Travelers hired two large law firms to defend Post-Tribune against the Suit under its Auto Policy, including appearances of record by at least five separate lawyers, Travelers did not provide any defense to Barnett as required under the Auto Policy.

77.    At no time prior to entry of the Hughes Judgments against Barnett did Travelers:

(a)  offer to defend Barnett;

(b)  disclose the fact that she was an insured under the Auto Policy and entitled to a defense against the Suit;

(c)  file a declaratory judgment action disclaiming Travelers obligations to defend and/or indemnify;

(d)  issue a reservation of rights regarding its obligations to defend and/or indemnify Barnett; and/or

(e)  disclose the existence and terms of the Auto Policy to Barnett or the Hughes despite repeated demands that the Auto Policy be produced.

78.    As a result of Travelers' failure to defend Barnett, she was forced to try to defend the Suit for more than seven years through her own counsel.  Barnett was ill-equipped to do so, as an elderly woman with very limited resources.

17

79.     At all relevant times, Barnett resided in a mobile home community with very limited income.  Abandoned by Travelers and left to her limited devices, Barnett attempted to compensate her lawyer by knitting him an afghan.

80.     No rational or principled basis existed for Travelers' refusal to defend Barnett against the Suit allegations while paying to defend its other insureds through multiple law firms against identical allegations.

81.     Contemporaneous with its refusal to defend Barnett against the Suit allegations, Travelers and Travelers-retained counsel actively concealed the available limits of insurance, the terms of the Auto Policy, Barnett's status as an insured, and concealed and misrepresented the existence or applicability of the Auto Policy.

82.     While Travelers concealed the policy, it simultaneously directed that Travelers-retained counsel file a lawsuit against Barnett alleging that she was responsible to reimburse any sums Travelers might expend to indemnify the Post-Tribune against liabilities arising from her alleged activities as an employee in the Suit.  These were the exact indemnity obligations Travelers actually owed to Barnett as an additional insured under the Auto Policy which Travelers misrepresented and concealed over the course of seven years of litigation.

*Concealment and Misrepresentation Regarding Available
Insurance Limits and the Auto Policy*

83.     In early 2008, following repeated requests that Travelers-retained counsel identify all applicable insurance information, such counsel identified what it claimed to be the applicable insurance policies and limits in a Certificate of Liability Insurance.  (February 8, 2008 Corresp., and Cert. of Insurance enclosed therewith, a true and accurate copy of which is attached at **Exhibit F**).

18

84.    The Certificate of Liability Insurance certified a $1,000,000 aggregate limit Commercial General Liability Policy as well as the Travelers' Auto Policy, which the Certificate of Liability Insurance indicated had a $1,000,000 combined single limit. The Certificate incorrectly indicated that there was no excess liability coverage in the form of an umbrella policy or otherwise. Only the Certificate was provided and the policies themselves were withheld.

85.    The parties proceeded with the Suit for nearly four years on the basis of representations by Travelers-retained counsel that the Certificate of Insurance identified all applicable policies and that total insurance limits were limited to $1,000,000.

86.    In early 2012, Travelers-retained counsel revealed for the first time that there might be an additional $20,000,000 of excess insurance available, notwithstanding the 2008 certification of a $1,000,000 primary policy with no umbrella.

87.    Following this revelation by Travelers-retained counsel, and given serious concerns that the parties receive all information regarding the actual insurance program, extensive efforts were made to obtain production of any and all potentially applicable policies of insurance. These efforts were obstructed by Travelers and Travelers-retained counsel, which included concealment of the Auto Policy and false representations regarding insurance made in correspondence, sworn interrogatory responses, executed court filings, and in representations made on the record in open court.

88.    On February 22, 2012, Plaintiffs served Kevin Hughes' First Set of Interrogatories and Requests for Production, which required that the Post-Tribune "[i]dentify all Policies of Insurance, as defined in Section III(D), including the applicable limits of indemnity coverage provided under each policy…" (Feb. 22, 2012 First Set of Interrog, p. 23., Interrog. 20). In the related Request for Production, Defendant was required to "produce certified copies

of all Policies of Insurance identified in response to Interrogatory 20, including any and all

declarations, endorsements, amendments, riders, or exhibits thereto."

89.    Despite prior misrepresentations regarding insurance, Travelers-retained counsel

responded by serving an unfounded boilerplate objection to identification or production of the

insurance policies themselves, stating:

> OBJECTION. Defendant objects to this request as overbroad, in
> subject matter scope and time scope, irrelevant, and not reasonably
> calculated to lead to the discovery of admissible evidence."

90.    Travelers-retained counsel did not identify any insurance information or produce

any policies despite the applicable trial rules explicitly requiring production of these materials.

91.    Concerned about the non-production of insurance policies and the prior

misrepresentations regarding insurance limits, counsel wrote numerous letters to Travelers-

retained counsel in an effort to obtain full disclosure of insurance information.

92.    In correspondence dated April 18, 2012, counsel noted to Travelers-retained

counsel "[f]our-and-a-half years into this case we do not so much as have the insurance limits in

this action so that we can make a qualifying settlement demand."  (*See* Apr. 18, 2012 Corresp. at

p. 1, a true and accurate copy of which is attached as **Exhibit G)**.

93.    In this same correspondence, counsel reiterated the significant amounts in dispute

in the case and the right of the parties to have complete insurance information, writing:

> As noted previously and repeatedly, we have a right to
> know these limits and contrary to the representation in your April
> 13 letter, these limits have not been disclosed by Gary Jansen, by
> you, or by anyone else despite our demands. During a pre-trial
> meeting, Mr. Jansen indicated that there was "at least" $20 million
> in insurance offered by Travelers, but conceded that there could be
> more and he claimed not to know at the time about possible excess
> insurance or coverage. This is not a disclosure of insurance limits.
> Rather, it is an incomplete oral disclosure of some of the insurance
> you claim is available.  As I responded at the time, due to the

20

> seriousness of Kevin Hughes, Jr.'s injury, it is imperative that we
> know the actual insurance limits, including whether there is
> insurance beyond $20 million. Given the facts of this case, that
> information is imperative and material to our ability to make a
> qualifying settlement demand.  As you know from the extensive
> medical documentation you have been provided, this is an
> extraordinarily serious traumatic brain injury case. We anticipate
> economic damages alone to exceed $12,000,000 and as we have
> made clear countless times, we need to know all of the applicable
> insurance information we are entitled to.

(*Id.* at p. 2).

94.     Travelers-retained counsel responded on April 23, 2012, again withholding all

insurance policies, including the Auto Policy under which Barnett was an insured, reiterating

that Travelers-retained counsel had "voluntarily provided [the Parties] with insurance coverage

information at the outset of this litigation" - referencing the February 8, 2008 disclosure falsely

certifying that there was a $1,000,000 primary auto policy but no umbrella insurance or excess

coverage.  (April 23, 2012 Corresp. at p. 1, a true copy of which is attached as **Exhibit H**).

95.     In further response, Travelers-retained counsel announced that he knew of the

excess insurance information when he represented $1,000,000 as the applicable insurance limits

and produced a certification confirming the same, asserting that he withheld excess insurance

information from the parties on the basis that his "review of Plaintiffs' medical records suggests

that excess insurance is not an issue in this case."  (*Id.*).

96.     This assertion by Travelers-retained counsel has no rational or principled basis in

fact given the established severe and permanent traumatic brain injuries suffered by Kevin.

97.     Travelers-retained counsel further claimed for the first time that in addition to a

$1,000,000 primary policy, there was a total of $25,000,000 of excess coverage.  This claim was

again later determined to be false, as there was a total of $125,000,000 of applicable excess

umbrella coverage.

21

98.     Travelers-retained counsel sill did not produce an insurance declarations page, a corrected certificate of liability coverage, or the insurance policies themselves in his response, including the applicable primary Auto Policy under which Barnett was insured against the allegations in Plaintiffs' Suit.

99.     Accordingly, Plaintiffs responded to Travelers counsel yet again unequivocally demanding full production of certified copies of all potentially applicable insurance, as it had been required to do in response to prior discovery:

> As noted previously and repeatedly, Post-Tribune's obligation with respect to insurance is simple.  The Post-Tribune was and is required to identify, with particularity, all available coverage, including identifying who the insurers are and providing certified copies of all policies.  Interrogatories in this regard must be signed and sworn to, particularly in light of prior representations by Mr. Papier that the insurance limits were $1,000,000. This is not a novel idea or a controversial concept: it is a discovery requirement in courts across America and an express requirement of the Indiana Trial Rules. It is not a request which is unduly burdensome or difficult to respond to and you have provided no explanation why these materials were not produced in response to discovery, as required, nor have you explained your refusal to provide such materials. **Accordingly, we would again demand a full, complete, unqualified identification of insurance information and production of all insurance policies, including schedules and endorsements, potentially applicable to any claim for recovery in this case.**

(*See* Apr. 26, 2012 Corresp., a true and accurate copy of which is attached as **Exhibit I**, emphasis in original).

100.     Having no success in obtaining the Auto Policy or other insurance information from Travelers-retained counsel, on this same date counsel made a direct demand to Travelers that it provide certified copies of all relevant policies potentially applicable to the Suit consistent with its duty of good faith and fair dealing.  (*See* April 26, 2012 Letter to Travelers and enclosures, a true and accurate copy thereof it attached as **Exhibit J**).  The correspondence

enclosed copies of the Summons and Complaint against Barnett and Post-Tribune and was sent

to Travelers via both facsimile and certified mail.

101.    The correspondence was unequivocal in its demand that Travelers produce the

Auto Policy and all other insurance information, stating:

> We have been attempting since early 2008 to obtain a
> certified copy of the Traveler's Policy, including all applicable
> schedules and endorsements.  However, the Post-Tribune has
> failed to produce these materials in response to our requests and
> has instead provided us only with a copy of a Declarations page.
> We have enclosed a copy of the Declarations page provided to us
> for your reference.
>
> As we have been unsuccessful in securing the policy
> through other means, please consider this a **formal request that
> Traveler's Property Casualty Company of America provide us
> with a certified copy of the policies referenced in the attached
> declaration page, consistent with Traveler's obligations of good
> faith and fair dealing.**
>
> We ask that you provide us with this information within the
> next 10 days. Thank you for your attention to this issue.

(*Id.* at pp. 2-3) (emphasis in original).

102.    Travelers made no response to this correspondence, did not produce the Travelers

Auto Policy, did not reveal Barnett was an additional insured entitled to a defense against the

Suit, and it continued to take no action to protect Barnett despite Travelers unquestionable

obligation to do so.

103.    Not receiving disclosure of the Policy information from Travelers-retained

counsel, despite no fewer than five written requests, and having received no response to the

certified letter from Travelers, on May 10, 2012, Plaintiffs filed their Motion to Compel which

sought, *inter alia*, an Order requiring production of certified copies of all insurance policies

potentially applicable to the Suit including all endorsements thereto.

23

104.    Following receipt of the Plaintiffs' Motion to Compel, Travelers-retained counsel purported to "supplement" its prior discovery with what was represented, under oath, to include all insurance policies potentially applicable to the Suit.  (*See* May 14, 2012 Supp. Resp. to Discov. at p. 24, true and accurate excerpts of which are attached as **Exhibit K**).

105.    In court filings, Travelers-retained counsel represented to the court, Barnett, and the Plaintiffs that by virtue of this supplemental production Travelers-retained counsel had "answered this interrogatory by disclosing the applicable insurance policies and stating the insurer, policy number, and limits of each policy."  (*See* May 25, 2012 Resp. to Mtn to Comp. at p. 13, a true and accurate excerpt of which is attached as **Exhibit L**).

106.    Representations made by Travelers-retained counsel in correspondence, sworn interrogatories, and court filings that it had produced all applicable insurance information were false.  The supplemental production did not identify or include the Auto Policy, which was previously shown on the incorrect Certificate of Liability as the applicable Policy to the Suit.

107.    It was again made clear to Travelers-retained counsel that the correct insurance information was being misrepresented and withheld and that the $1,000,000 primary Auto Policy was shown on the "Certificate of Insurance" was not included in the identification or part of the production.  Counsel's court filings explicitly noted that Defendant had "not provided Plaintiffs with all of the correct underlying insurance policy information…" (*See* Plaintiff's June 7, 2012 Reply at p. 21).

108.    In light of the ongoing failure to simply produce the applicable Auto Policy, Plaintiffs explicitly inquired whether the Auto Policy provided coverage to Linda Barnett's vehicle at the time of the car crash.  Jeramie Hughes' First Request for Admissions and Related Interrogatories, Request 1 asks:

> Please admit that the automobile operated by Defendant Barnett on
> September 9, 2007 at the time of the incident giving rise to
> Plaintiffs' Claims was a "covered auto" under a Policy of Insurance
> issued by Traveler's Property Casualty Company of America,
> Policy Number TC2JCAP281K6779-TIL07 issued to Defendant
> Post-Tribune ("Travelers Policy").

109.     Travelers-retained counsel, who was acting at Travelers direction under its duty to

defend, and who was an experienced insurance coverage lawyer, made an effective denial of this

Request to Admit, responding:

> Defendant cannot truthfully admit or deny the matters herein
> because it has no knowledge whether LINDA BARNETT's
> automobile was a "covered auto" under the referenced policy.
> Further, Defendant is unable to determine said matters because
> LINDA BARNETT's automobile is not referenced in the subject
> policy, and Defendant has no expertise in interpretation of
> insurance policies.  Defendant has made reasonable inquiry and the
> information known or readily obtainable by Defendant is
> insufficient to enable Defendant to admit or deny said matters.

(Def. May 29, 2012 Resp. at p. 2, a true and accurate excerpt of which is attached as **Exhibit M**).

110.     Travelers-retained counsel continued to misrepresent in court filings and in open

court that all insurance information had been produced.  Travelers and Travelers-retained

counsel knew that the Auto Policy was the applicable primary policy and it Travelers was

defending Post-Tribune pursuant to that Auto Policy.

111.     Despite diligent efforts to obtain full production of the Auto Policy and other

insurance information, Travelers did not produce a copy of the Auto Policy until April 14, 2015,

more than a month after the Hughes Judgments were entered against Barnett and more than

seven years after the filing of Plaintiffs' Suit requiring Travelers to provide a defense to Barnett.

112.     In producing the policy for the first time in April 2015, Travelers-retained counsel

attempted to justify the seven-year concealment of the Auto Policy with specious claims that (a)

no one had ever requested the Auto Policy, and (b) the Post-Tribune had never made any claim

under the Auto Policy:

> Contrary to your letter, Plaintiffs have never issued a request for production of the Travelers Business Auto Policy. Plaintiffs' First Set of Interrogatories and Related Document Production Requests to Defendant Post-Tribune requests all "Policies of Insurance" (request to produce related to Interrogatory 20). Plaintiffs' Interrogatories and Related Production Requests define "Policies of Insurance" as all insurance policies under which the Post-Tribune "has made a claim" for indemnity for any liability arising against it as a result of this case. Post-Tribune has not made a claim under the Travelers Business Auto Policy. Although the definition of "Policies of Insurance" also includes policies which the Post-Tribune "may" claim a right for indemnity in the future, the term "may" is obviously vague and speculative. Further, Post-Tribune is no longer in existence and cannot make a claim on a policy in the future. Therefore, Plaintiffs have never requested in discovery the Travelers Business Auto Policy.

(See April 14, 2015 G. Jansen Corresp., **Exhibit N**).

113.    These representations were false and were known to be false to Travelers and Travelers-retained counsel at the time they were made as (1) Post-Tribune was making a claim under the Auto Policy and had done so dating back to December 2007; (2) Travelers was defending Post-Tribune under the Auto Policy, without reservation of rights, and had been doing since December 2007; and (3) production of the Auto Policy identifying Barnett as an insured was explicitly and repeatedly requested through formal discovery, by Motion to Compel, in extensive written correspondence, and orally. Such efforts are well documented.

114.    In sum, Travelers failed to defend Barnett without any basis and actively concealed, withheld, and misrepresented: (1) amounts of available insurance, (2) the existence and applicability of the Auto Policy; (3) the terms of the Auto Policy making the Barnett and the Barnet vehicle a covered auto for purposes of the Suit; and (4) the fact that Barnett was entitled to a defense and indemnity against the allegations in Plaintiffs' Suit.

26

*Travelers' Suit for Indemnity Against Barnett*

115.    While engaged in these active concealment efforts, Travelers directed and paid for its retained counsel to initiate suit against Barnett claiming a right to recover from Barnett any sums that Travelers might expend to indemnify Post-Tribune for a judgment arising from Barnett's employment with the Post-Tribune.  Although this claim was nominally asserted via a "cross-claim" filed by Travelers-retained counsel via the Post-Tribune, the suit was paid for and directed by Travelers and brought in enforcement of Travelers' alleged subrogation rights under the Auto Policy.

116.    The Auto Policy provides, in pertinent part, that "[i]f any person or organization to or for whom we make payment under this Coverage Form has rights to recover damages from another, those rights are transferred to us" *See* Auto Policy, **Exhibit D** Part IV.A.5, "Transfer of Rights of Recovery Against Others to Us."

117.    Because Travelers had agreed to pay, without reservation of rights, all defense and indemnity costs against Post-Tribune up to Travelers' $26,000,000 limits, all of the Post-Tribune's rights to recover against any third-party were held by Travelers and brought on its behalf.

118.    In asserting this claim for indemnity, Travelers-retained counsel explicitly recognized that the only way that Post-Tribune could be found liable in the action was vicariously based upon findings that Barnett acted as an employee, pleading:

> 13.    In their Second Amended Complaint, Plaintiffs allege that
> BARNETT was acting within the scope, and in furtherance, of her
> employment relationship with POST-TRIBUNE.  Plaintiffs further
> allege that POST-TRIBUNE is vicariously liable for such acts
> under principles of agency, vicarious liability and/or the doctrine
> of respondeat superior.

27

      14.    As a result, only vicarious liability – rather than direct negligence – is alleged against POST-TRIBUNE.

(Cross-Claim for Indem., p. 4, ¶¶ 13-14).

119.    The indemnity suit then seeks to recoup from Barnett sums that Travelers would pay indemnifying a judgment against Post-Tribune predicated explicitly upon Barnett's activities while in the scope of her employment. (*Id.* at ¶ 16).

120.    As set forth hereabove, Barnett herself entitled specifically entitled under the Auto Policy to be indemnified by Travelers against any judgment rendered as the result of her alleged employment activities for the Sun Times or Post-Tribune. Were a judgment entered against the Post-Tribune based on Barnett's alleged actions as an employee, as alleged by Travelers, it was unquestionably Travelers obligation to pay that judgment on Barnett's behalf as an additional insured under the Auto Policy. Traveler's was suing Barnett to obtain the very benefits that it owed her and was actively concealing.

121.    Travelers' pre-judgment indemnity suit against Barnett is unprecedented and is not consistent with Travelers' regular policies and practices in bringing such suits. The suit was not only without any legal merit but was also without economic substance, as Travelers and Travelers-retained counsel was aware that Barnett had no resources and that any indemnity action was unlikely to net any recovery to Travelers. Suit against Barnett was specifically intended to be harassing and vexatious and served no other legal or practical purpose.

122.    Travelers essentially demanded that Barnett, an elderly woman living in a mobile home community, act as Travelers' reinsurer against claims that Travelers knew were its responsibility to pay on Barnett's behalf all while concealing and explicitly misrepresenting those obligations.

<u>Plaintiffs' October 17, 2013 Settlement Demands and</u>
<u>Travelers' Failure to Respond or Evaluate Them</u>

123.    Abandoned and without knowledge that she was a Travelers insured against both the Hughes Suit and the suit Travelers was bringing against her, Barnett was left to defend these actions with virtually no resources at her disposal.  Discovery continued over the course of many years, during which time Plaintiffs provided extensive documentary evidence regarding Kevin's permanent brain injuries.

124.    Following nearly six years of litigation, on October 17, 2013 the Hughes tendered comprehensive Settlement Demands ("Demands") to both the Post-Tribune and Barnett.  These Demands consisted of a 41-page narrative overview of liability, the history of Kevin's injuries, comprehensive documentation of Kevin's current and future claimed economic loss, and life care planning documents.

125.    Nearly 300 pages of supporting documentation was included with the Demands, including a study of 60 comparable injury verdicts and settlements involving traumatic brain injuries ranging from mild to severe.  Of these, some 54 consisted of awards greater than $20,000,000, nearly half exceeded $30,000,000 and approximately one-third exceeded $40,000,000.  Detailed summaries of these comparable verdicts and awards were provided.

126.    Supporting materials forwarded with the Settlement Demand included an accident engineering report with on-board vehicle data, Life Care Plan documentation by Dr. Paul Deutsch, and economic loss analysis of Dr. James Bernard.  The demand included documentation of Kevin's claimed economic loss, including past medical expenses, past and future lost earnings, and future medical care in an amount as much as $11,783,000.

127.    The Settlement Demand package documented Plaintiffs' intention to seek an award at trial of at least $43,124,005.  Plaintiffs offered to resolve Kevin's claims against Post-Tribune and Barnett in the compromise amount of $34,000,000 and Jeramie's claims in the amount of $275,000.  The settlement demand was time limited to 30-days and expired without response on November 16, 2013.

128.    At this time, the parties remained unaware of Barnett's status as an additional insured under the Travelers Auto Policy as a result of Travelers' concealment of the Auto Policy.

129.    Although Travelers continued to conceal the Auto Policy and Barnett's status as an insured at the time of the Demand, the demands against both Barnett and Post-Tribune were sent to Travelers-retained counsel.  (See Oct. 17, 2013 Ltr. to G. Jansen, **Exhibit O**).  Upon information and belief, Travelers-retained counsel forwarded the settlement demands to both Post-Tribune and Barnett to Travelers' claims adjusters.

130.    Travelers failed to respond to the demands as to either the Post-Tribune or Barnett and failed to even acknowledge that the demands were made or received.  Travelers continued to conceal the Auto Policy and Barnett's status as an additional insured during this period and during times the settlement demands were pending.  The $34,000,000 Settlement Demands against Post-Tribune and Barnett lapsed without any response.

*Plaintiffs' Discovery Regarding Defenses to Damages*

131.    Together with their Settlement Demands, Plaintiffs served detailed damage discovery to the Post-Tribune and Barnett, including efforts to determine whether Defendants disputed any of the claims for damages outlined in their Settlement Demand.  (*See* Hughes' Second Set of Req. to Admit, Related Doc. Prod. Request and Rogs to Def. Post-Tribune and Barnett, served Oct. 17, 2013).

132.    In response, neither Barnett nor Post-Tribune articulated any basis for disagreeing with the claims for damages in the Plaintiffs' Settlement Demand and supporting materials and failed to identify or produce any contravening damage evidence.  On November 8, 2013, after more than six years of litigation, Travelers-appointed counsel responded to this damage discovery by claiming that it:

> "has no knowledge regarding the alleged injuries sustained
> by KEVIN HUGHES, JR…."

(*See* Nov. 8, 2013 Resp. at p. 2)
.

133.    Travelers-retained counsel further responded to related interrogatories and document production requiring Post-Tribune to identify contrary damage evidence by responding that it would be unable to do so because the Post-Tribune had no employees.  (*Id.* at 4).  Travelers-retained counsel asserted Post-Tribune would be unable to identify any damage evidence contravening the settlement demand because "Defendant has no employees.  There are no persons in Defendant's employ or control who have knowledge of such matters, and the information sought is not contained within Defendant's records."  (*Id.*).

134.    Defendant Barnett likewise did not respond to the damage discovery materials.

*Entry of Summary Judgment Against Linda K. Barnett While Travelers' Failed to Defend Her,
Concealed Her Status as an Insured, and Failed to Respond to Settlement Demands Against Her*

135.    Having received no evidence controverting the sums documented and requested in the Plaintiffs' October 17, 2013 Settlement Demand, Plaintiffs proceeded to file for summary judgment against Linda Barnett on or about December 6, 2013.

136.    Moving for summary judgment against Barnett was necessitated to allow Kevin and Jeramie to proceed against $50,000 which had been interpleaded with the Lake County Clerk's office by Enterprise Rental Car in 2009.  At the time of the accident, Barnett was driving

a rented car and her personal auto insurance had expired due to non-payment. Accordingly, Enterprise interpleaded the minimum financial responsibility limits for distribution to accident injury victims.

137.    While these funds should have been subject to quick distribution by agreement of the parties injured in the crash, Travelers directed and paid for its retained counsel to appear in the interpleader action to oppose distribution of even these minimal sums to the injury victims. Travelers-retained counsel claimed, without basis whatsoever, that the Post-Tribune (and thus Travelers as its insurer) had an interest in these funds which were explicitly only subject to claims made by injury victims. These claims, asserted on behalf of Travelers through its transfer of rights clause, were meritless and further make clear the unreasonable, vexatious, and malicious approach taken by Travelers.

138.    Plaintiffs' motion for summary judgment against Barnett was supported by an extensive Designation of Evidence totaling nearly 600 pages.

139.    Travelers-retained counsel for the Post-Tribune requested an extension of time for the purposes of opposing this motion, which was granted, and Travelers-retained counsel filed a Response in Opposition on January 3, 2014. Consistent with its prior discovery response that it had no damage evidence controverting Plaintiffs' claims, however, Travelers-retained counsel submitted no evidence in opposition to Plaintiffs' damage claims.

140.    A full hearing and oral argument was held, at which Travelers-retained counsel appeared and argued against the entry of summary judgment. The matter was submitted and on March 10, 2015, the court granted the Hughes' Motions for Summary Judgment against Barnett on all issues and entered judgments against her in a document styled "Entry of Final Judgment Linda K. Barnett" attached as **Exhibit A**.

141.    These judgments provide in pertinent part:

> Final Judgment is entered in favor of Kevin Hughes, Jr. and against Linda K. Barnett in the sum of Twenty-Three Million Four Hundred Fifty Seven Thousand Four Hundred Thirty One Dollars ($23,457,431.00).
>
> ***
>
> Final Judgment is entered in favor of Jeramie Hughes, Jr. and against Linda K. Barnett in the sum of One Hundred Ninety Three Thousand Six Hundred Sixty Nine Dollars ($193,669.00).

(*Id.* at pp. 2-3).

142.    Since March 10, 2015, these judgments have accrued statutory interest at a rate of 8% per annum as required by I.C. § 24-4.6-1-101, which provides "interest on judgments for money whenever rendered shall be from the date of the return of the verdict or finding of the court until satisfaction at… an annual rate of eight percent (8%) if there was no contract by the parties."

143.    As of March 8, 2017, the Kevin Hughes Judgment is valued at $27,205,478 and the Jeramie Hughes Judgment is $224,613, resulting in total liabilities of **$27,430,091** as of that date.  The Hughes Judgments continue to accrue interest in an amount of **$1,892,088** per annum until satisfied.

144.    At no time prior to entry of the Hughes Judgment did Travelers tender an offer to defend Barnett, issue a reservation of rights under the Auto Policy, or seek declaratory judgment.

145.    Travelers did not produce the Auto Policy for the first time until more than seven years of litigation had passed and over 30 days after the Hughes Judgments were entered.  When Travelers finally did produce the policies, it denied that the Auto Policy was applicable to claims in the Hughes Suit and denied that any claim had ever been made on the Auto Policy by Post-Tribune, despite actual knowledge that these assertions were false.  At the same time, Travelers continued to prosecute patently frivolous indemnity claims against Barnett.

146.    In November 2016, after nine years of defending litigation in which Travelers had been required to defend Barnett but instead elected to sue her - and 18 months after the Court entered the Hughes Judgments against her - Barnett reached a negotiated settlement with Plaintiffs, the terms of which are attached at **Exhibit B**.

147.    As part of this negotiated settlement, the Hughes obtained an assignment of all causes of action held by Barnett against Travelers, their representatives and agents, including those causes sounding in breach of contract, breach of duty of duties of good faith and fair dealing, and fraudulent concealment and misrepresentation.  (*Id.* at pp. 9-10, ¶ 4).

### COUNT I – DECLARATORY JUDGMENT AND DEMAND FOR SPECIFIC PERFORMANCE

148.    Plaintiffs restate and incorporate by reference rhetorical paragraphs 1 – 147 as though fully set forth herein.

149.    Travelers Property issued the Auto Policy attached as **Exhibit D** to Sun-Times Media in Illinois as the primary named insured under the Auto Policy.  Sun-Times and Post-Tribune are additional insureds under the Policy by virtue of an endorsement making any of Sun-Times Media's majority owned companies an insured under the policy.

150.    Barnett was an insured and entitled to a defense by Travelers against claims asserted against her in the Suit by virtue of policy endorsement CA T3 94 01 04.

151.    Travelers was timely put on notice of claims against the Sun Times, Post-Tribune and Barnett and in actual possession of the Second Amended Complaint on or before December 17, 2007.  Travelers was actually and/or constructively aware of the Suit and the allegations against its insureds on or before this date and at all times thereafter.

152.    Travelers had an obligation arising under the Illinois insurance program issued to Sun-Times Media to defend Sun Times, Post-Tribune, and Barnett in the Suit, whether or not

34

claims alleged in the Suit were meritorious.

153.   Travelers accepted its obligation to defend Sun Times and Post-Tribune, and Travelers hired multiple large law firms to defend Post-Tribune, including appearances by five different lawyers.  Travelers accepted its duty to defend and indemnify Sun Times and Post-Tribune unequivocally and without reservation of rights.

154.   Travelers intentionally, negligently, recklessly, and/or otherwise failed to provide Barnett with a defense to the Suit as required by the Auto Policy.  At all relevant times, Travelers concealed Barnett's status as an additional insured under the Auto Policy and refused to produce the applicable Auto Policy to the parties despite repeated and explicit demands.

155.   This pattern continued for more than seven years of litigation, culminating in summary judgment proceedings against Barnett and the entry of the Hughes Judgments against her.

156.   At no time did Travelers issue a reservation of rights to Barnett or seek declaratory judgment asserting any limitation on Travelers' duty to defend or indemnify Barnett from allegations in the Suit.

157.   Travelers' failure to defend Barnett was without excuse or justification.

158.   As a result of Travelers' abandonment of its insured and failure to defend Barnett against a Suit alleging claims within its coverage obligation to her, Travelers is obligated to pay the existing Hughes Judgments, inclusive of judgment interest accruing thereon at a rate of 8% per annum from March 10, 2016.

159.   Full satisfaction of the judgments includes Travelers payments of the $23,457,431 Kevin Hughes judgment and the $193,669 Jeramie Hughes judgment under the indemnity limits of the Auto Policy and Travelers Excess Policy, as well as all interest presently accrued or which

may accrue in the future under the Supplemental Payments provision set forth in Section

II.2.a(6) of the Auto Policy.  This provision provides that Travelers must pay on behalf of its

insured "[a]ll interest on the full amount of any judgment that accrues after entry of the

judgment" without reduction to the available Limits of Insurance.

160.    Pursuant to the federal Declaratory Judgment Act, 28 U.S.C. § 2201 and § 2202,

Kevin and Jeramie Hughes, directly and as assignees of Barnett, are entitled to and pray for a

declaration and judgment finding that Travelers is liable and required to indemnify Barnett, and

pay over to Kevin Hughes, Jr. and Jeramie Hughes, the full amount of the Hughes Judgments

entered against Barnett in the Suit together with judgment interest accruing thereon from March

10, 2015 until satisfaction.

WHEREFORE, Plaintiffs respectfully request entry of a declaratory judgment and decree

against Travelers as set forth hereabove and hat Travelers satisfy the Hughes Judgments, including

accrued statutory interest in a sum total of **$27,430,091** as of March 8, 2017, that it pay all interest

further accruing thereafter, and for all other relief proper in the premises.

## COUNT II – BREACH OF CONTRACT BY TRAVELERS

161.    Plaintiffs restate and incorporate by reference rhetorical paragraphs 1 – 160 as

though fully set forth herein.

162.    Travelers owed Barnett a contractual duty to defend her in the Suit under the Auto

Policy as set forth hereabove.

163.    Travelers breached its obligation to Barnett, without excuse, abandoning Barnett

to her own effort to defend the Hughes' action for over seven years despite lacking any adequate

resources to do so.

164.    The court's grant of summary judgment in the Suit and entry of the Hughes

36

Judgments against Barnett following Travelers' failure to defend Barnett was a direct, proximate, foreseeable, and consequential result of Travelers' breach of its contractual duties under the Auto Policy.

165.    As a direct, proximate, foreseeable, and consequential result of Travelers' breach of its duty to defend, Barnett incurred liability in the form of the March 10, 2015 Hughes Judgments, and post-judgment interest accruing thereon, irrespective of any duties to indemnify in performance of the Auto Policy.

166.    Barnett has assigned to Kevin and Jeramie all contractual rights and causes of action related to the acts and omission set forth hereabove.

167.    Kevin and Jeramie Hughes, as assignees of Barnett, are entitled to recover the full amount of the Hughes Judgments and all interest thereon as consequential damages arising from Travelers' breach.

WHEREFORE, Kevin Hughes, Jr. and Jeramie Hughes, as assignees of Barnett, demands judgment against Travelers in the amount of the Hughes Judgments and accrued statutory interest, valued at **$27,430,091** as of March 8, 2017, all interest accruing thereafter, and any and all other damages or losses accruing to Barnett as a consequence of Travelers' breach of its duties arising under the Auto Policy contract.

## COUNT III - BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

168.    Plaintiffs restate and incorporate by reference rhetorical paragraphs 1 – 167 as though fully set forth herein.

169.    Travelers owed Barnett, as an additional insured, a fiduciary duty and duty of good faith and fair dealing in fulfilling its duties under the Auto Policy and Travelers Excess Policy.  Travelers' duty of good faith and fair dealing applied to Travelers in a variety of ways,

including but not limited to its determination of its defense obligations to Barnett, its fulfillment of defense obligations, its disclosure of its obligations to Barnett under the Auto Policy, its adjustment and management of claims against Barnett, its communications with Barnett, and its evaluation and response to settlement demands proffered by Plaintiffs in the Suit.

170.    In fulfilling its duties of good faith and fair dealing with Barnett, Travelers was obligated to:

a.    refrain from misrepresenting or concealing pertinent facts and/or insurance policy information related to: the existence of the Auto Policy; limits available under the Auto Policy; applicability of the Auto Policy; Barnett's status as an insured under the Auto Policy; and/or Barnett's right to a defense and indemnity against allegations asserted against Barnett in the Suit;

b.    acknowledge and act reasonably promptly upon communications with respect to claims arising under the Auto Policy, including responding to requests to obtain copies of the Auto Policy and to acknowledge and respond to demands for settlement;

c.    adopt and implement reasonable standards for prompt investigation of claims;

d.    affirm or deny coverage of claims within a reasonable time;

e.    attempt in good faith to effectuate prompt, fair, and equitable settlements of claims once liability had become reasonably clear;

    f.      not compel and direct suit against its insured, Barnett, in order to recover amounts from Barnett under its subrogation rights that it would actually owe to Barnett under its policy;

    g.      not undertake actions to place Travelers' interests ahead of those of Barnett in violation of duties owed to her;

    h.      not affording greater rights and preference to one set of its insureds, Sun Times and Post-Tribune, over the rights of its other insured, Barnett;

    i.      act faithfully and honestly; and/or

    j.      otherwise acting in good faith, dealing fairly with Barnett, and complying with all other obligations of good faith and fidelity imposed by law.

171.    Travelers breached one or more of these obligations in engaging in the course of conduct enumerated in the Common Allegations hereabove. This bad faith conduct includes, but is not limited to, intentionally, recklessly, and/or in a manner grossly negligent:

    a.      failing to defend Barnett despite no rational, principled reason not to do so and despite Travelers' defense of Post-Tribune and Sun Times against identical allegations without reservation of rights;

    b.      concealing Barnett's status as an insured under the Auto Policy against claims asserted in the Suit against her;

    c.      misrepresenting the applicable insurance limits available under Sun-Times Media's program of insurance;

    d.      misrepresenting the non-applicability of the Travelers Auto Policy to Suit claims;

    e.      refusing to produce the Auto Policy and misrepresentations that all

applicable policies had been produced;

f.    filing a lawsuit against Barnett asserting indemnity rights against Barnett to recover the precise indemnity benefits Travelers in fact owed to Barnett under the Auto Policy while actively misrepresenting and concealing these obligations;

g.    failing to review, evaluate, or consider the October 17, 2013 settlement demand to Barnett despite actual possession of the same;

h.    failing to properly and honestly communicate with Barnett about the Suit claims against her or Travelers' obligations to her under the Policy;

i.    failing to properly investigate, adjust, set reserves, manage, or consider claims asserted by the Hughes against Barnett in the Suit;

j.    failing to take any proper action to protect Barnett in the Suit for seven years prior to entry of the Hughes Judgment or to take any other action to protect her after entry of the Hughes Judgments; and/or

k.    otherwise acting in bad faith and/or deliberate or reckless disregard for the duties owed by Travelers to Barnett as outlined herein.

172.    Travelers engaged in fraudulent and/or deceptive activity as set forth in **Count IV** and such conduct further and independently constitutes a breach of Travelers duties of good faith and fair dealing.

173.    Travelers further breached duties of good faith and fair dealing to Barnett by intentionally and/or recklessly putting its interests, and those of its other insureds, before that of Barnett with knowledge that such conduct could or was likely to injure Barnett.

174.    The acts and omissions of Travelers and its appointed agents and representatives

were willful, wanton, reckless, and/or resulted from malice, fraud, gross negligence, and/or oppressiveness towards Barnett.

175.    As a direct and proximate result of Travelers' bad faith and breach of its fiduciary duties, Barnett has incurred liability in the form of the Hughes Judgments, which represents a liquidated sum of **$27,430,091** as of March 8, 2017, plus additional interest accruing at 8% per annum.  Barnett has further suffered non-economic loss, including loss of enjoyment of life and emotional distress, as a direct and proximate result of Travelers' breach of its duty of good faith and fair dealing.

176.    Kevin, as assignee of Barnett, is entitled to recover from Travelers the full amount of the Hughes Judgments entered against Barnett, all interest accruing thereon, and all other damages directly and proximately resulting from Travelers' breach of its duties of good faith and fair dealing.

177.    Kevin, as assignee of Barnett, is entitled to recover punitive damages, in an amount no less than three times the amount of Barnett's existing judgment obligation, or **$82,290,273** as of March 8, 2017, and in the maximum amount permitted by law, as necessary to punish Travelers for its conduct and to deter it from engaging in similar conduct in the future.

WHEREFORE, Kevin Hughes, Jr., as assignee of Barnett, demands judgment against Travelers in an amount no less than the liquidated Hughes judgments plus applicable interest, valued at **$27,430,091** as of March 8, 2017, all other damages proximately resulting from Travelers' breach of its duty of good faith and fair dealing, and punitive damages at a minimum amount of **$82,290,273** and in the maximum amount permitted by law.

### COUNT IV – ACTUAL AND CONSTRUCTIVE FRAUD AND MISREPRESENTATION

178.    Plaintiffs restate and incorporate by reference rhetorical paragraphs 1 – 177 as

41

though fully set forth herein.

179.    During the pendency of Suit, Travelers, its agents, representatives, and attorneys made material representations of past and/or existing facts to Kevin Hughes, Jr., Jeramie Hughes, Barnett, and their representatives and/or made implied representations through their silence, despite a duty to disclose material facts.

180.    Such material misrepresentations and omissions are detailed in the Common Allegations at Paragraphs 83 - 130 and elsewhere in this Complaint, incorporated here by reference.

181.    Travelers made actual, constructive, and/or implied misrepresentations and/or material omissions or representations of existing facts to Plaintiffs and Barnett including:

a.    That the insurance limits applicable to Plaintiffs' Suit were $1,000,000 with no excess insurance in 2008;

b.    Later representing there was $20,000,000 in excess insurance and then representing that limits of excess insurance were $25,000,000;

c.    That the Auto Policy was not applicable to Plaintiffs' Suit;

d.    That Barnett was not an insured under the Auto Policy against Plaintiffs' allegations in the Suit or entitled to a defense at Travelers expense;

e.    That Barnett was not an insured under the Auto Policy against Plaintiffs' allegations in the Suit and entitled to indemnity from Travelers under the same circumstances Travelers would be obligated to indemnify Sun Times and Post-Tribune;

f.    That Barnett had an obligation to indemnify Post-Tribune, and thereby Travelers, for any judgment entered against her due to her employment with

Post-Tribune, despite Travelers being actually aware that it was obligated to pay such a judgment on Barnett's behalf as an insured under the Policy;

g.   That all insurance information had been produced despite concealing and refusing to produce the applicable Auto Policy under which Barnett was an insured; and/or

h.   Otherwise making false statements of material fact as outlined further herein.

182.   Travelers owed a duty to Plaintiffs and Barnett to be honest and not misrepresent any of the foregoing matters, either expressly or through its silence.  The foregoing actual, constructive, and/or implied misrepresentations and/or material omissions were false, materially deceptive, and were relied upon substantially by Plaintiffs and Barnett.  Travelers owed a duty not to materially misrepresent, expressly, constructively, or by its silence, any of the foregoing matters, all of which were untrue and material.

183.   The foregoing representations or omissions were made by Travelers, its employees, agents and representatives with actual knowledge of their falsity and/or with reckless ignorance of their falsity and/or understanding that a failure to disclose additional facts would induce a mistaken belief relied upon by Plaintiffs and Barnett.

184.   The foregoing acts of Travelers and its appointed agents and representatives were willful, wanton, reckless, and/or the result of malice, fraud, gross negligence, and/or oppressiveness on the part of Travelers.

185.   Barnett has assigned to Kevin Hughes, Jr. all claims she holds against Travelers arising from the aforedescribed conduct.

186.   Plaintiffs, individually, and Kevin Hughes, Jr. as assignee of Barnett, are entitled

to recover as compensatory damages all injuries proximately resulting from Travelers' actual of constructive fraud and misrepresentations, including, but not limited to, the full sum of the judgment entered against Barnett, interest accruing thereon, and all other economic and non-economic losses incurred by Barnett as the result of Travelers' actual, constructive, and/or silent fraud and misrepresentation.

187.    Plaintiffs, individually, and Kevin Hughes, Jr. as assignee of Barnett, are entitled to recover punitive damages, in an amount appropriately determined by the trier of fact to punish Travelers and deter it from engaging in similar future conduct.

WHEREFORE, Plaintiffs, individually, and Kevin Hughes, Jr., as assignee of Barnett, demand judgment Travelers in an amount fully compensating them for economic and non-economic losses resulting therefrom, including the Hughes Judgments, statutory interest accruing thereon, and punitive damages in the maximum amount allowable by law.

Respectfully submitted,

Attorneys for Plaintiffs

**SCHAFER & SCHAFER**

s/ Timothy S. Schafer
Timothy S. Schafer
3820 E. U.S. 30
Merrillville, In 46410
tschafer@schaferandschafer.com
Phone:  219-947-1911
Fax: 219-947-1701

**KEITH F. MEDVED P.C.**

_s/_ Keith F. Medved
Keith F. Medved
Galleria Building II
275 U. S. Hwy. 30, Suite 250
Dyer, Indiana  46311
k.medved@sbcglobal.net
Tel:  219-322-1169
Fax: 1-866-891-1166

s/ Jason J. Paupore
Jason J. Paupore
11983 N. Tamiami Trail, Suite 147
Naples, Florida 34110
jpauporelaw@gmail.com
Phone: 239-362-9190
Fax: 239-362-9190

## JURY DEMAND

Plaintiffs hereby demands, pursuant to Federal Rule of Civil Procedure 38, that this matter

be tried by jury as to all matter so triable.

Respectfully submitted,

Attorneys for Plaintiffs:

**SCHAFER & SCHAFER**

s/ Timothy S. Schafer
Timothy S. Schafer
3820 E. U.S. 30
Merrillville, In 46410
tschafer@schaferandschafer.com
Phone:  219-947-1911
Fax:     219-947-1701

45

**KEITH F. MEDVED P.C.**

*s/* Keith F. Medved
Keith F. Medved
Galleria Building II
275 U. S. Hwy. 30, Suite 250
Dyer, Indiana  46311
k.medved@sbcglobal.net
Tel:  219-322-1169
Fax:  1-866-891-1166

s/ Jason J. Paupore
Jason J. Paupore
11983 N. Tamiami Trail, Suite 147
Naples, Florida 34110
jpauporelaw@gmail.com
Phone: 239-362-9190
Fax: 239-362-9190